# United States Court of Appeals
## For the First Circuit

No. 21-1568

THOMAS SWARTZ,

Plaintiff, Appellant,

v.

NORMAN SYLVESTER; TOWN OF BOURNE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Joseph L. Sulman, with whom Law Office of Joseph L. Sulman, Esq. was on brief, for appellant.

Gareth W. Notis, with whom Morrison Mahoney LLP was on brief, for appellees.

November 21, 2022

**GELPÍ**, **Circuit Judge**. Plaintiff-Appellant Thomas Swartz ("Swartz") appeals from the decision of the district court for the District of Massachusetts granting summary judgment to Defendants-Appellees Norman Sylvester ("Sylvester") and the Town of Bourne, Massachusetts. Swartz contends that his constitutional rights under the Free Exercise Clause of the First Amendment were violated when Sylvester, in his role as Fire Chief of the Bourne Fire Department ("BFD"), ordered Swartz, a firefighter, to sit for a photograph in violation of Swartz's religious beliefs. Swartz refused to take the photograph and was disciplined as a result of his refusal. Swartz brought suit against Sylvester under 42 U.S.C. § 1983 asserting the discipline constituted a violation of his constitutional rights under the Free Exercise Clause. In addition, he alleged that the Town of Bourne and Sylvester violated his rights under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, by failing to pay him for certain unused vacation and other accrued time off following his subsequent retirement from the BFD. On the Section 1983 claim, the district court granted summary judgment to Sylvester on qualified immunity grounds. The district court declined to exercise supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(c). It then dismissed the state law claim without prejudice. We affirm.

## I. Background

When reviewing a district court's decision on a motion for summary judgment, "we always recount [the facts] in the light most favorable to the nonmovant (here, that's [Swartz])." Johnson v. Johnson, 23 F.4th 136, 139 (1st Cir. 2022). Thomas Swartz was a firefighter working for the BFD in Bourne, Massachusetts from July 1997 until August 2018, when he retired. Norman Sylvester began in his role as the BFD's Fire Chief in February 2015. All members of the BFD had an identification card as well as an accountability tag, which both featured a picture of the firefighter.[1] The photographs on the identification cards and accountability tags were inconsistent -- some firefighters wore t-shirts in their photographs while others wore ties. In 2016, Sylvester, seeking consistency among the photographs on the identification cards, began a policy of photographing the firefighters in their Class A uniforms for these photographs. The Class A uniform is a formal dress uniform worn at occasions such as ceremonies, weddings, and funerals.

---

[1] The accountability tag and the identification card looked the same but served different purposes. Accountability tags had a hole in the top of the card which was used to keep track of personnel at fire scenes and was attached to the firefighter's gear, while the identification card stayed in the firefighter's wallet and was used to identify firefighters in circumstances when they were not in their gear.

Sylvester stated that he wanted consistent photographs of all the firefighters in their Class A uniforms "so everybody looked the same [and] so we had a professional department." He also planned to hang the headshots on a bulletin board in the main lobby of the fire station so members of the public could identify firefighters who had done a good or bad job at a fire scene and be aware of who worked for the BFD. He noted that the firefighters' names would not accompany the photographs. Other members of the BFD said they understood that the photographs would be used for media and promotional purposes. BFD Lieutenant Richard Emberg stated that Sylvester told him that the photographs would be used on a display wall and could also be submitted to the media in the case of a firefighter's death in the line of duty. BFD Lieutenant Paul Weeks similarly stated that Emberg had told him that the photographs would be used on a display board and also in response to requests from the media if there was, for example, a promotion or a tragedy.

Sylvester enlisted Emberg to help him organize the photographs of the firefighters in their Class A uniforms. On November 4, 2015, Emberg sent an e-mail to all BFD employees which read, "Anyone wishing to have a class A photo done. The photographer will be available Friday. If interested contact me please for times." On January 30, 2016, Deputy Fire Chief Joseph Carrara e-mailed all BFD employees, stating that "Lt. Emberg has

been working to arrange professional photos for all department members." Carrara said Emberg was compiling a list in regards to Class A uniforms and, in preparation for the photographs, implored the firefighters to check in with their deputies if they were missing any part of the Class A uniform that would be needed for the photograph. On March 11, 2016, Emberg e-mailed all BFD employees, stating "[i]n the next few weeks all members will be getting a department photo taken by the department photographer" in their Class A uniforms. On April 11, 2016, Emberg sent another e-mail to all BFD employees, setting forth a schedule when the Class A uniform photographs would be taken for all employees, which were split into four groups. Weeks was the deputy chief supervising group three, to which Swartz was assigned.

On May 1, 2016, Emberg sent an e-mail which read that group three's Class A photographs would be taken the following day at noon, and if employees were unable to make that time slot, they should try to attend another one of the scheduled dates.[2] The next day, May 2, 2016, Weeks verbally informed the members of his group, which included Swartz, that they would have their photographs taken that day in their Class A uniforms. Swartz responded that he did not want to have his photograph taken. This caught the attention of Sylvester, who had the office next to Weeks and overheard the

[2] It is unclear from the record whether this e-mail was sent to the entire department, though it appears it was.

exchange. Sylvester asked Swartz to step into his office to discuss the matter further and Swartz asked if they could shut the door and speak privately. Swartz asked whether the photographs were going to be used for identification tags or other department identification. Sylvester responded by asking Swartz, "What if you get promoted and I want to send a picture of you to the newspaper?" Swartz then informed Sylvester that he didn't want to have his photograph taken for religious reasons. He further explained that having his photograph taken for promotional purposes is against his religious beliefs.[3] Sylvester asked Swartz if he had a driver's license to which Swartz responded that he did. Sylvester asked how he took that photograph, but he did not recall Swartz's answer.[4] Sylvester then asked Swartz to put his objection in writing.

Swartz did so. On that same day, May 2, 2016, he sent Sylvester an e-mail, stating that he requested not to participate in "portrait photography for use other than accountability" because "[p]ortrait photography for personal recognition goes against [his] religious beliefs." In response, Sylvester stated

---

[3] Swartz described himself as a confirmed Catholic and stated that he currently practices Christianity. He stated that he attends Mass almost every Sunday at a Catholic church. He elaborated that he derives his belief that he cannot participate in acts of self-promotion from the First Commandment.

[4] Although Sylvester testified to these facts, the district court did not make a finding on them.

that his request was respectfully denied because the "photos are in fact for use by the [BFD] as a form of accountability and Department Identification as a member of [BFD]," that his participation was "a requirement as an order from the Town of Bourne Fire Chief" and "[f]ailure to follow this order will result in disciplinary action." On May 5, 2016, Emberg sent an e-mail stating that May 6 and May 9 would be the last two days for firefighters to have a photograph taken in their Class A uniform. The e-mail further stated that "[t]he chief has mandated these photos." The parties agree that this e-mail was sent to all BFD employees. Swartz did not have his photograph taken on either May 6 or May 9.

For disobeying Sylvester's direct order to have his photograph taken in his Class A uniform, Swartz was subsequently disciplined. Swartz was placed on administrative leave for the night shift on May 10, 2016, and the day shift on May 12, 2016, per Sylvester's order. Following a disciplinary meeting on May 13, 2016, the disciplinary action taken against Swartz was twenty-four hours of unpaid administrative leave (which he had already served on May 10 and May 12) and that he would not be eligible for "out of grade" opportunities (which result in higher pay) for a period of at least six months, a decision which would be reevaluated after six months. Following a discussion with

Sylvester, Swartz opted to take the unpaid administrative leave out of his vacation time.

As of May 13, 2016, there were four other BFD employees who had not had their photographs taken in their Class A uniforms. According to Sylvester, this was because those employees were off duty when the photographer came in, unlike Swartz, who was on duty when the photographer was there. Sylvester also noted that none of the other four employees who missed their photograph opportunity declined to sit for the photograph, as Swartz had. As of October 1, 2019, all BFD employees had ID cards and accountability tags with photographs, with the exception of a recently hired employee. However, Sylvester was still working to ensure that the identification photographs all depicted the firefighters in their class A uniforms. Swartz ended his employment with the Town of Bourne on August 22, 2018, when he retired.

Swartz filed the instant complaint against Sylvester in December 2018 under 42 U.S.C. § 1983 for violation of his rights under the Free Exercise Clause of the First Amendment. In March 2019, he moved to amend his complaint to add a claim against the Town of Bourne and Sylvester under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, for failure to pay him for certain unused vacation time and other accrued time off following his separation from the BFD. The motion to amend the complaint was granted. Following discovery, in November 2020, Sylvester and the

Town of Bourne moved for summary judgment on both counts. In June 2021, the district court granted Sylvester's motion for summary judgment. Swartz v. Sylvester, 546 F. Supp. 3d 37, 57 (D. Mass. 2021).

The district court concluded that Sylvester was entitled to qualified immunity on the Section 1983 claim. It found that there was no genuine dispute of material fact and that Sylvester satisfied both prongs of the qualified immunity analysis. Accordingly, the district court granted summary judgment in favor of Sylvester. The district court then declined to exercise supplemental jurisdiction over the state court claim and dismissed it without prejudice.

## II. Discussion

### A. First Amendment Claim and Qualified Immunity

#### 1. Standard of Review

We review a district court's order granting summary judgment de novo. Conlogue v. Hamilton, 906 F.3d 150, 154 (1st Cir. 2018). Qualified immunity protects government officials, such as Sylvester, from liability when they act under color of state law, Gray v. Cummings, 917 F.3d 1, 9 (1st Cir. 2019), and when their actions or decisions, "although injurious, 'do[] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Conlogue, 906 F.3d at 154 (alteration in original) (quoting Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." City of Tahlequah v. Bond, 142 S. Ct. 9, 11 (2021) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)).

"Under the familiar two-prong framework, courts ask (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022) (quoting Conlogue, 906 F.3d at 155). Though we refer to them as the first and second prong, the two prongs need not be addressed in that order. Conlogue, 906 F.3d at 155. "[A]n [official] may be entitled to immunity based on either prong." Est. of Rahim, 51 F.4th at 410. Upon de novo review, we agree with the district court in that Sylvester did not violate Swartz's constitutional rights and is entitled to qualified immunity based on the first prong.

### 2. District Court Decision

The district court found that Sylvester was entitled to qualified immunity. As to the first prong, whether the facts are sufficient to establish a violation of a constitutional right, the district court found that they were not. First, the district court noted that the parties agreed that Sylvester's order and Swartz's subsequent discipline were facially neutral. The district court then evaluated whether reasonable jurors could conclude that the

purpose of the neutral directive was to coerce Swartz into violating sincere religious principles, and found that they could not. Despite Swartz's contention that the timing evidenced Sylvester's hostility towards Swartz's religious beliefs (specifically, making the photographs mandatory in response to Swartz's denial), the district court disagreed. It concluded that there was no evidence that Sylvester's reasons for the directive were pretextual and that it was generally applicable to all firefighters. The district court further found that the initial order was mandatory, but that even if it had not been, that fact would not permit an inference that Sylvester's order was enacted because of his religious beliefs as opposed to in spite of them. Because the order was facially neutral and generally applicable, the district court applied rational basis review, and found that the policy of taking the photographs of the firefighters in their Class A uniforms -- namely, to promote the integrity of the BFD -- fell within said standard. Therefore, under the first prong of the qualified immunity analysis, the district court found no violation of Swartz's rights under the Free Exercise Clause.

The district court proceeded to analyze the second prong of the qualified immunity test. It concluded that, even assuming that there was a violation of Swartz's rights under the Free Exercise Clause, "the contours of those rights were not sufficiently clear such that a reasonable official would have

understood that what he was doing was a violation." The court noted that neither party pointed to an analogous case and, in cases where the officer was acting under "similar circumstances," City of Escondido v. Emmons, 139 S. Ct. 500, 504 (2019) (quoting Wesby, 138 S. Ct. at 590), courts had declined to find a constitutional violation. Finally, the court concluded that in the instant case, "a reasonable officer would not have understood [that] his conduct would violate the right to the free exercise of religion." The district court elaborated that it was reasonable that Sylvester did not immediately understand Swartz's religious beliefs. Further, it found that once Swartz clarified that he refused to have his photograph taken for promotional purposes, a reasonable official would not think that a photograph taken for accountability and identification purposes would violate Swartz's religious beliefs. Accordingly, the district court concluded that Sylvester was entitled to qualified immunity on the second prong as well.

### 3. Analysis

We first discuss the free exercise principles that will guide our analysis of the first prong of the qualified immunity framework, on the issue of whether Sylvester violated Swartz's constitutional rights. The First Amendment's Free Exercise Clause provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." It has been incorporated against the states by the Fourteenth

Amendment. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) (citing Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)). "[Swartz]'s claim was properly brought pursuant to 42 U.S.C. § 1983, which allows individuals to 'sue certain persons for depriving them of federally assured rights' under color of state law." Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir. 2022) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008)). The parties do not dispute, and we agree, that Sylvester, as Fire Chief of the BFD, could be held liable under Section 1983 if he did indeed violate Swartz's constitutional rights. We turn to that question now.

"[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494 U.S. 872, 879 (1990) (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). Therefore, we decline to find a constitutional violation when a neutral and generally applicable law or policy "incidentally burdens free exercise rights . . . if it is rationally related to a legitimate governmental interest." Does 1-6 v. Mills, 16 F.4th 20, 29 (1st Cir. 2021), cert. denied sub nom. Does 1-3 v. Mills, 142 S. Ct. 1112 (2022). We utilize heightened scrutiny when a law or policy

is not neutral or generally applicable, "sustain[ing] it only if it is narrowly tailored to achieve a compelling governmental interest." Id. To qualify as neutral, a policy must not target religious beliefs or practices "because of their religious nature." See Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1877 (2021) (first citing Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, 138 S. Ct. 1719, 1730-32 (2018); and then citing Lukumi, 508 U.S. at 533). If the policy's objective is to impede or constrain religion, the policy is not neutral. See Lukumi, 508 U.S. at 533 (citation omitted). Additionally, a policy must be generally applicable to avoid heightened scrutiny. To qualify as generally applicable, a policy cannot selectively burden conduct motivated by religion while simultaneously exempting the conduct's secular counterpart. See Lukumi, 508 U.S. at 543. If a policy permits "individualized governmental assessment of the reasons for the relevant conduct," it is not generally applicable. See Dep't of Hum. Res. of Or., 494 U.S. at 884.

Swartz argues that a reasonable juror could find that Sylvester's conduct (i.e., his directive regarding the photograph and Swartz's subsequent discipline) was not neutral or generally applicable. As to the evidence supporting this contention, Swartz cites the sequence of events surrounding his refusal to be photographed and his subsequent discipline. Specifically, he contends that Sylvester's directive to have a photograph taken

only became a mandatory order when Swartz objected on religious grounds, and that fact raises an inference of discriminatory intent and hostility towards Swartz's religious beliefs. Swartz contends that the evidence, viewed in the light most favorably to him, permits a reasonable juror to infer that

> Sylvester's decision to order Swartz and the rest of the BFD to participate in the Class A photograph was predicated on Sylvester's hostility towards Swartz's religious-based objection and thus to his religious beliefs, or in the alternative, that the purpose of Sylvester's order was to coerce Swartz into violating his sincerely held religious beliefs.

Accordingly, Swartz argues, Sylvester's conduct should be analyzed under strict scrutiny and, when so analyzed, Sylvester cannot establish that his conduct furthered a compelling government interest and was narrowly tailored.

First, we cannot agree that Sylvester's conduct was not neutral. Clearly, it was facially neutral. See Swartz, 546 F. Supp. 3d at 50 ("Here, the parties agree that Sylvester's directive, and the subsequent discipline administered to Swartz, were facially neutral."). Swartz must therefore prove that Sylvester's conduct was undertaken because of Swartz's religious beliefs. See Fulton, 141 S. Ct. at 1877 ("[The g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."); Lukumi, 508 U.S. at 533 ("[I]f the object of

a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral"). We are mindful that the Free Exercise Clause "'forbids subtle departures from neutrality' and 'covert suppression of particular religious beliefs.'" Lukumi, 508 U.S. at 534 (first quoting Gillette v. United States, 401 U.S. 437, 452 (1971); and then quoting Bowen v. Roy, 476 U.S. 693, 703 (1986)). When assessing neutrality, "a court must 'survey meticulously' the totality of the evidence, 'both direct and circumstantial.'" New Hope Fam. Servs., Inc. v. Poole, 966 F.3d 145, 163 (2d Cir. 2020) (quoting Lukumi, 508 U.S. at 534, 540). This includes the series of events leading to the conduct, as well as the historical background. Id.

Swartz's evidence on this point is primarily the sequence of events leading to the Class A photographs becoming mandatory -- specifically, the speed with which they became mandatory after he objected on religious grounds, which he claims raises an inference that the order was because of his religious exemption.[5] Even assuming arguendo that it is true the photographs became mandatory immediately after Swartz objected to them, that fact alone does not establish that Sylvester took that action because of Swartz's religious beliefs. See Lukumi, 508 U.S. at

[5] We note that Swartz's argument on this point contradicts the district court's finding that communications sent before Swartz objected indicate that the photographs were in fact mandatory prior to his objections. Swartz, 546 F. Supp. 3d at 50.

540-41 (determining object of ordinances was discriminatory as they "were enacted '"because of," not merely "in spite of"' their suppression of [the relevant] religious practice" (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979))). Unlike in Lukumi, where hostile statements were made regarding the religious practice prior to the law's enactment, 508 U.S. at 540-41, Sylvester did not show hostility toward Swartz's religious beliefs, but instead asked further questions about it to determine if he could implement the policy without infringing on Swartz's beliefs. When Swartz clarified that he could not have his photograph taken for promotional purposes (for example, to be sent to the media), Sylvester attempted to avoid infringing on Swartz's religious beliefs by clarifying that the photographs would be used for identification and accountability purposes.

Additionally, in Lukumi, both the text of the ordinances and their effect "compel[led] the conclusion that suppression of the central element of the [religious practice] was the object of the ordinances." 508 U.S. at 534. The record before us does not compel such a finding. Beyond pure speculation, Swartz offers no evidence that would allow a reasonable juror to conclude that the requirement to have Class A photographs taken became mandatory because of his religiously motivated objection to having his photograph taken, rather than simply because he objected. See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140 (1st Cir. 2013) ("[A

plaintiff] cannot deflect summary judgment with pure speculation . . . ."); Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010) ("A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation."). Swartz has not proffered sufficient evidence that would permit a reasonable juror to conclude that the rule was not neutral.[6]

Sylvester's conduct was also generally applicable. "[Policies] burdening religious practice must be of general applicability." Lukumi, 508 U.S. at 542. "To be generally applicable, a law may not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct." Mills, 16 F.4th at 29. A policy or course of conduct may run afoul of general applicability if it "'invite[s]' the government to consider the particular reasons for a person's conduct by providing

[6] We note that, although Swartz mentions that other employees in his department did not get their photographs taken on the initial dates set by the department and were not subsequently disciplined, he does not develop an argument that explains how that fact could support a finding that the policy at issue was not neutral. Therefore, any such argument is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Nevertheless, even if Swartz had developed such an argument, it would not succeed. As we will explain in our discussion below regarding Swartz's contention that the policy was not generally applicable, there is no evidence in the record that anyone else in the department objected to it, and so the treatment of those employees does not support a finding that the policy was enacted because Swartz objected for religious reasons rather than the fact that Swartz objected, independent of the reason for the objection.

'a mechanism for individualized exemptions.'" Fulton, 141 S. Ct. at 1877 (quoting Smith, 494 U.S. at 884).

As the district court found, the directive was generally applicable to all firefighters in the BFD. Swartz, 546 F. Supp. 3d at 52. By the time Swartz was disciplined on May 10, when he was placed on administrative leave, all firefighters had been informed that Sylvester mandated the photographs. Insofar as Swartz can be read to argue that Sylvester granted an exemption from the photograph requirement to the other firefighters who did not get their photographs taken on the initial dates set by the department and were not subsequently disciplined, and that this rendered the policy not generally applicable, we disagree. As a preliminary matter, Swartz develops no argument on how the fact that other firefighters were not disciplined created an exemption and, if so, how the presence of this exemption would bear on whether the policy was generally applicable, so these arguments are waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But even addressing these arguments on the merits would not help Swartz. Swartz failed to bring forth any evidence of Sylvester granting exemptions from the photograph requirement to other firefighters (if any) that objected, and indeed conceded in his briefing to us that though "Sylvester disciplined Swartz and no other BFD members," "it is not in dispute that these other BFD employees did not object to having their Class A photograph

taken." The fact that some BFD employees did not have their photographs taken because they were not on duty when the photographer came to the station does not change our conclusion that the directive was generally applicable, because they did not object to having their photographs taken as Swartz did. Further, Swartz did not bring forth any evidence that there was a mechanism for individualized exemptions within Sylvester's directive or that the directive invited Sylvester to consider the reasons for requesting an exemption.

Accordingly, finding that Sylvester's conduct was both neutral and generally applicable, we do not apply heightened scrutiny, but will "sustain the [policy] against constitutional challenge if it is rationally related to a legitimate governmental interest." Mills, 16 F.4th at 29. Sylvester's directive passes rational basis review. As both parties agree that one purpose of the photographs was for a public bulletin board and for media requests as needed, Swartz, 546 F. Supp. 3d at 53, the photograph policy is rationally related to the legitimate governmental interest of publicizing the BFD and promoting the integrity of government institutions. In his brief, Swartz does not challenge the district court's conclusion that Sylvester's directive would pass rational basis review. Instead, he focuses his briefing on whether the directive would pass strict scrutiny and argues that it would not. We agree with the district court that the directive

easily satisfies rational basis review. See Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 9 (1st Cir. 2011) ("Rational basis review 'is a paradigm of judicial restraint.'" (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993))). Moreover, as we explained supra, strict scrutiny is not triggered in this instance. See Mills, 16 F.4th at 30-32 (declining to apply strict scrutiny when emergency rule was both neutral and generally applicable).

Upon de novo review, we agree with the district court's conclusion that Sylvester did not violate Swartz's constitutional rights as required by the first prong of the qualified immunity analysis. Because we may find qualified immunity under either prong of the two-prong test, Est. of Rahim, 51 F.4th at 410, we accordingly affirm the district court's decision that Sylvester was entitled to qualified immunity as to the federal claim against him.

### B. Supplemental State Law Claim

#### 1. Standard of Review

"We review a district court's decision regarding the exercise of supplemental jurisdiction for abuse of discretion." Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC, 730 F.3d 67, 72 (1st Cir. 2013). "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). The district court may decline to exercise said jurisdiction when it "has dismissed all claims over which it has original jurisdiction." Id. § 1367(c)(3).

**2. Analysis**

Swartz argues that because the district court erred in dismissing his Section 1983 claim, it also abused its discretion in dismissing his Massachusetts Wage Act claim against Sylvester and the Town of Bourne. Concluding, as we do, that the district court did not err in granting Sylvester's motion for summary judgment on the federal law claim, we see no abuse of discretion in its decision to decline to exercise supplemental jurisdiction over the remaining state law claim. See Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 114 (1st Cir. 2020) ("We have held that a district court may decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction, 28 U.S.C. § 1367, and absent certain circumstances inapplicable here, doing so is not an abuse of discretion.").

**III. Conclusion**

The judgment of the district court is

**AFFIRMED**.